# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HELICOPTER HELMET, LLC, and GOVERNMENT SURPLUS SALES, INC. d/b/a GOVERNMENT SALES, INC., <br><br> Plaintiffs <br><br> v. <br><br> GENTEX CORPORATION, FLIGHT SUITS d/b/a GIBSON & BARNES, and JAMES T. WEGGE, <br><br> Defendants. | No. 1:17-CV-00497 <br><br> (Judge Brann) |

## MEMORANDUM OPINION

### MAY 1, 2018

Gentex Corporation, Gibson & Barnes, and James T. Wegge filed a motion to dismiss the amended complaint filed by Helicopter Helmet, LLC, and Government Surplus Sales, Inc. For the reasons that follow, those motions are granted.

## I. BACKGROUND[1]

### A. The Parties

Defendant Gentex Corporation, Plaintiff Helicopter Helmet, LLC ("HHC"), and Plaintiff Government Surplus Sales, Inc. ("GSS"), all manufacture helmets for use by helicopter passengers.[2] Defendant Flight Suits d/b/a Gibson & Barnes ("G&B") is the exclusive distributor of Gentex's helicopter helmets.[3] Defendant James Wegge is G&B's director.[4]

### B. G&B's 2013 Advertising Campaign and the White Papers

In 2013, G&B ran an advertisement titled "Is Your Helmet a Dangerous Counterfeit?"[5] The ad stated that "[t]housands of helicopter pilots and crews wear dangerous counterfeit helmets," which "look like real [Gentex] helmets . . . [b]ut are assembled from obsolete, defective, and 20-year-old military-surplus parts."[6] Such helmets, the ad stated, "aren't even tested," and contain parts that "can hurt you in a side impact."[7]

---

[1] When considering a motion to dismiss for failure to state a claim, a court assumes the truth of all factual allegations made in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The material in this section, then, is taken entirely from Plaintiffs' Amended Complaint, ECF No. 29, and is presumed true for present purposes.

[2] ECF No. 29 (Amended Complaint) ¶ 15.

[3] *Id.* ¶ 4.

[4] *Id.* ¶ 5.

[5] Ex. C to ECF No. 29.

[6] *Id.*

[7] *Id.*

Also in 2013, G&B issued a number of publications on "[t]he [u]se of [o]bsolete and [n]onconforming" parts in helicopter helmets.[8] These documents—styled "White Papers"—noted that certain unidentified "[c]ompanies" were developing their own replacement parts for certain types of helicopter helmets; these replacement parts, however, "did not conform to . . . military specifications."[9] As a result, the White Papers charged, helmets containing these parts were dangerously unsafe.[10] The White Paper on "obsolete" or "nonconforming" earcups, for example, contained a graph showing the results of drop tests performed on a "mil-spec" helmet and on an unidentified "[n]onconforming [h]elmet" ("Drop Test Graph").[11] That White Paper also contained an image showing damage to an unidentified helmet with "[n]onconforming" parts after a drop test ("Damaged Helmet Graphic").[12] None of the White Papers mentioned any helicopter helmet manufacturer by name.[13]

---

[8] Ex E to ECF No. 29.

[9] *See, e.g.*, Ex. E to ECF No. 29 ("The Use of Obsolete and Nonconforming Earcups in Commercial SPH Helicopter Helmets") at 3.

[10] *See, e.g.*, *id.* at 5.

[11] *Id.*

[12] *Id.*

[13] The White Papers talked about the use of such parts in "SPH" helmets. *Id.* Although not identified in the White Papers, Gentex is the manufacturer of such helmets. ECF No. 29 (Amended Complaint) at 4 n.2.

### C. The Accident Prevention Bulletin and the Aviation Life Support Equipment Handbook

One of these White Papers made its way to the United States Department of the Interior ("DOI").[14] As a result, the DOI's Office of Aviation Services ("OAS"), with the assistance Defendants, issued an Accident Prevention Bulletin ("AP Bulletin").[15] Similar to the White Papers, the AP Bulletin warned of the dangers of helicopter helmets with "outdated components" that fail to meet military specifications, and contained copies of the Drop Test Graph and the Damaged Helmet Graphic.[16] Unlike the White Papers, however, the AP Bulletin mentioned a helicopter helmet manufacturer by name; specifically, it noted that the earcups in some of Gentex's helmets— "original version[s]" of the SPH-4B model—"do not meet current agency standards," and that owners of that helmet should purchase a "conversion kit." The AP Bulletin, though, did not mention any other manufacturer. As a result of the safety issues highlighted in the AP Bulletin, the DOI's Bureau of Land Management ("BLM") awarded G&B a sole source contract for Gentex helmets.[17]

Defendants' relationship with the OAS continued after the issuance of the AP Bulletin. The OAS publishes an Aviation Life Support Equipment Handbook

---

[14] ECF No. 29 (Amended Complaint) ¶ 23.

[15] *Id.* ¶ 24.

[16] Ex. F to ECF No. 29.

[17] ECF No. 29 (Amended Complaint) ¶ 28; Ex. G to ECF No. 29.

("2008 ALSE Handbook"), which "regulates all helmets that are purchased for [federal] government agencies."[18] Among other things, the ALSE Handbook notes which helicopter helmets have been approved[19] for use by DOI personnel, specifically identifying several of Gentex's helmets as well as several helmets by other manufacturers.[20] After the publication of the AP Bulletin, Defendants "caused DOI personnel" to draft[21] an updated ALSE Handbook ("2013 ALSE Handbook") that listed only Gentex helmets as "approved," removing all references to non-Gentex helmets.[22]

### D. Investigation by the Department of the Interior's Office of the Inspector General

Although the 2013 ALSE Handbook never made it out of draft form, it was relied upon by the DOI for some helmet contracts.[23] As a result, HHC complained to the DOI's Office of the Inspector General ("OIG").

The OIG's summary report on this incident noted that it investigated "allegations that a helicopter helmet company misled the [BLM] to believe that

---

[18] ECF No. 29 (Amended Complaint) ¶ 13.

[19] To meet DOI approval, helicopter helmets must either (1) conform to a United States Military standard, (2) be otherwise approved for use in United States Military helicopters, or (3) conform to a American National Standard Institute standard. Ex. A to ECF No. 29 ("ALSE Handbook") at 3.

[20] *Id.*

[21] ECF No. 29 (Amended Complaint) ¶ 29.

[22] Ex. H to ECF No. 29 (2013 ALSE Handbook) at 8-9.

[23] ECF No. 29 (Amended Complaint) ¶ 30.

only one type of helicopter helmet, available only through a single vendor, was acceptable for DOI use," as well as "alleg[ations] that the company and other vendors colluded with BLM personnel to draft an update of the [2008 ALSE Handbook] to benefit only two companies . . . ."[24] The summary report, however, found only that the DOI "improperly applied helmet standards from the draft [2013 H]andbook, which was pending approval, rather than the standards listed in the currently[-]approved handbook."[25] It did not contain any finding on the alleged collusion.

As a result of the investigation, BLM cancelled the sole-source contract with G&B and the OAS removed the AP Bulletin from its website.[26] In a letter to the OIG, OAS noted that, in the future, it would "ensure that all data solicited from, or provided by, the aviation industry is vetted for accuracy and free of any advertising rhetoric prior to incorporating the language into publications."[27] The letter also indicated OAS's intention to "publish a list of the helmet models that have met the ALSE [H]andbook standards in a manner that affords frequent updates."[28]

---

[24] Ex. I to ECF No. 29.

[25] *Id.*

[26] Ex. J to ECF No. 29 (OAS Response to Management Advisory of Investigative Results).

[27] *Id.*

[28] *Id.*

### E. Procedural History

Plaintiffs initiated this action on May 1, 2017. Their operative complaint narrates the above allegations and argues that Defendants' actions, which were intended to drive Plaintiffs out of business, violated federal antitrust laws, state defamation and civil conspiracy law, the Delaware Consumer Fraud Act, the Federal Trade Commission Act, and the Lanham Act, and unjustly enriched Defendants at Plaintiffs' expense.[29] Defendants have moved to dismiss this complaint for lack of personal jurisdiction, improper venue, and failure to state a claim.[30]

## II. DISCUSSION

### A. Standard of Review

When considering a motion to dismiss for failure to state a claim upon which relief may be granted,[31] a court assumes the truth of all factual allegations in the plaintiff's complaint and draws all inferences in favor of that party;[32] the court does not, however, assume the truth of any of the complaint's legal conclusions.[33] If a complaint's factual allegations, so treated, state a claim that is plausible – *i.e.*,

---

[29] ECF No. 29.

[30] ECF Nos. 37 and 39.

[31] Federal Rule of Civil Procedure 12(b)(6).

[32] *Phillips v. County Of Allegheny*, 515 F.3d 224, 228 (3rd Cir. 2008).

[33] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3rd Cir. 2016).

if they allow the court to infer the defendant's liability – the motion is denied; if they fail to do so, the motion is granted.[34]

### B. Whether This Court Has Personal Jurisdiction Over G&B and Mr. Wegge

G&B and Mr. Wegge argue that this Court lacks personal jurisdiction over them, and that Plaintiffs' suit should be dismissed on that basis.

Personal jurisdiction takes two forms: general jurisdiction and specific jurisdiction.[35] Plaintiffs do not argue that this Court has general jurisdiction over G&B and Mr. Wegge; consequently, Plaintiffs must show the existence of specific jurisdiction. To do so, Plaintiffs must point to competent evidence in the record.[36]

This Court's exercise of personal jurisdiction is limited only by the Due Process Clause.[37] Therefore, Plaintiffs need merely show some "affiliation between [Delaware] and the underlying controversy"—*i.e.*, show that the suit arises out of or relates to G&B and Mr. Wegge's contacts with Delaware.[38]

---

[34] *Id.*

[35] *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S.Ct. 1773, 1780 (2017).

[36] *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009).

[37] Federal Rule of Civil Procedure 4(k)(1)(A) (indicating that this Court's jurisdiction is determined by Delaware's jurisdictional statutes); 10 Del. C. § 3104(c) (Delaware's long-arm statute); *Hercules Inc. v. Leu Trust and Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992) (noting that Delaware's long-arm statute is "to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause").

[38] *Bristol-Myers Squibb Co.*, 137 S.Ct. at 1780-81.

Plaintiffs have sustained their burden. Their complaint alleges several causes of action based on, *inter alia*, Defendants' alleged creation and dissemination of the White Papers.[39] And they have produced uncontroverted evidence that G&B and Mr. Wegge distributed these White Papers into Delaware.[40] This Court, therefore, has specific personal jurisdiction over G&B and Mr. Wegge.

### C. Whether Venue Is Proper in This Court as to Mr. Wegge

Mr. Wegge argues that venue is improper in this Court as to the antitrust claims against him. He observes that the Clayton Act allows a plaintiff to sue a defendant "in the district in which the defendant resides or is found,"[41] and notes that he neither resides in, nor can be found in, Delaware.

In federal antitrust cases, however, venue may be established under the Clayton Act *or* under the general venue statute.[42] The general venue statute, in turn, states that an action may be brought in any judicial district "in which a substantial part of the events or omissions giving rise to the claim occurred."[43]

---

[39] ECF No. 29 (Amended Complaint) ¶ 22.

[40] ECF No. 50-1 (Affidavit of Ron Abbott) ¶ 5.

[41] 15 U.S.C. § 15(a).

[42] *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 855 (11th Cir. 1988)

[43] 28 U.S.C. § 1391(b)(2)

And as noted above, Plaintiffs' claim is partly based on Defendants' dissemination of White Papers into Delaware.[44] Therefore, venue is proper in this Court.

> D. **Whether There Is a Private Right of Action Under the Federal Trade Commission Act**

Gentex, G&B, and Mr. Wegge argue that there is no private right of action under the Federal Trade Commission. In response, Plaintiffs abandon that claim.[45]

> E. **Whether Plaintiffs Have Stated a Claim for Unjust Enrichment**

Gentex, G&B, and Mr. Wegge argue that Plaintiffs have not stated a claim for unjust enrichment because they have not alleged a nexus between their loss and Defendants' gain.

Under Delaware law, unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[46] To plausibly allege their claim for unjust enrichment, then, Plaintiffs must allege some relationship between their impoverishment and Defendants' enrichment.[47]

---

[44] ECF No. 29 (Amended Complaint) ¶ 22.

[45] ECF No. 42 (Plaintiffs' Opposition to Gentex's Motion to Dismiss) at 2 n.3.

[46] *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).

[47] *Eastern Savings Bank, FSB v. Cach, LLC*, 124 A.3d 585, 592 n.28 (Del. 2015) ("In order to show unjust enrichment, there must be (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.")

In their complaint, Plaintiffs allege that unjust enrichment occurred when the BLM awarded a sole-source contract to Defendants, since HHC had previously provided helmets to that agency's Alaska State Office.[48] Plaintiffs do *not* allege, however, that they had any vested right or interest in providing helmets to the BLM—they do not, for example, allege that the BLM breached any contract with them in order to deal with Defendants. This circumstance, therefore, cannot be classified as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another." And Plaintiffs do not identify any other direct "relationship between [Defendants'] enrichment and [Plaintiffs'] impoverishment." Therefore, their unjust enrichment claim will be dismissed.

### F. Whether Plaintiffs Have Stated a Claim for Defamation

Gentex, G&B, and Mr. Wegge argue that Plaintiffs have not stated a claim for defamation because none of the allegedly defamatory statements mention any of the Plaintiffs directly.

Under Delaware law, a plaintiff bringing a claim for defamation must allege that the statement at issue "refers to the plaintiff."[49] Here, Plaintiffs point to several of G&B's advertisements that warn of unsafe "counterfeit" helicopter helmets, and to the White Papers which discuss the safety of various "obsolete"

---

[48] ECF No. 29 (Amended Complaint) ¶¶ 28, 119.

[49] *Grubbs v. University of Delaware Police Department*, 174 F. Supp. 3d 839, 861 (D. Del. 2016).

and "nonconforming" helicopter helmet parts.[50] None of these publications, however, mention any Plaintiff either directly or obliquely. Plaintiffs argue that, in light of small number of helicopter helmet manufacturers that supply the national market,[51] G&B's statements must be understood as referring to HHC or GSS. Plaintiffs, however, point to no Delaware legal authority supporting such a "group libel" theory, nor can this Court find any.[52] Even if such authority existed, this Court cannot see how the advertisements or the White Papers could plausibly be understood to refer to HHC or GGS. Therefore, Plaintiffs' defamation claims will be dismissed.

## G. Whether Plaintiffs Have Stated a Claim Under the Delaware Consumer Fraud Act

Gentex, G&B, and Mr. Wegge argue that Plaintiffs have not stated a claim under the Delaware Consumer Fraud Act ("DCFA") because the allegedly actionable statements identified by Plaintiffs are neither false, misleading, confusing or likely to cause any misunderstanding.

---

[50] Exs. D and E to ECF No. 29.

[51] ECF No. 29 (Amended Complaint) ¶ 15.

[52] *Cf. Provisional Government of Republic of New Afrika v. American Broadcasting Companies, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985) ("A defamatory statement directed against a group or class does not generally give rise to a cause of action on behalf of its individual members. In order to be actionable by an individual, the publication must contain statements that are reasonably susceptible of application to the individual.")

The DCFA creates liability for a host of deceptive trade practices.[53] Plaintiffs claim that Defendants' publication of the Damaged Helmet Graphic violated the DCFA's prohibition on "false or misleading statements of fact" that "disparage[] the goods or services, or business of another."[54] Specifically, Plaintiffs aver that this graphic "was intended to unlawfully influence expectations of what would happen if a consumer did not wear a Gentex helmet . . . [and to] damage the reputation of products produced by HHC, GS[S], and other competitors."[55] As an initial matter, this Court notes that Plaintiffs do not claim that the Damaged Helmet Graphic is false—*i.e.*, Plaintiffs do not claim that the pictured helmet was not actually damaged after a drop test. Instead, Plaintiffs claim that the graphic is misleading because the helmet "in fact passed the impact test required by ALSE standards."[56] This Court, however, fails to see how it would be misleading for an advertiser to fail to point out the positive aspects of its competitors' products. Further, I fail to see how the graphic disparages Plaintiffs' goods, since it does not identify either HHC or GSS as the manufacturer of the helmet. In fact, Plaintiffs' *complaint* doesn't even identify the manufacturer of the

---

[53] 6 Del. C. § 2532(a).
[54] *Id.* § 2532(a)(8).
[55] ECF No. 29 (Amended Complaint) ¶ 101.
[56] *Id.* ¶ 27.

pictured helmet, other than to say that it was "non-Gentex."[57] In sum, the Damaged Helmet Graphic does not violate the DCFA.

Plaintiffs also claim that Defendants' reference to the SPH-5 helmet as "Mil-Spec" in the White Papers violated the DCFA's prohibition on trade practices that create a "likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another."[58] Specifically, Plaintiffs aver that this reference causes consumers to believe that the SPH-5 helmet has been somehow approved by the United States Military.[59] The White Papers themselves, however, make it obvious that "Mil-Spec" simply means "conform[ing] to the current military specifications."[60]

Plaintiffs' DCFA claims, therefore, will be dismissed.[61]

---

[57] *Id.*

[58] 6 Del. C. §2532(a)(3)

[59] ECF No. 29 (Amended Complaint) ¶ 102.

[60] ECF No. 29-1, Ex. E ("The Use of Obsolete and Nonconforming Earcups In Commercial SPH Helicopter Helmets") at 11; ("The Use of Obsolete and Nonconforming Retentions In Commercial SPH Helicopter Helmets") at 11; ("The Use of Obsolete and Nonconforming Shells In Commercial SPH Helicopter Helmets") at 7.

[61] Gentex argues that the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to claims under the DCFA. Because Plaintiffs have failed to state a claim under the customary, lower pleading standard, it need not—and does not—decide whether Rule 9(b) is applicable.

## H. Whether Plaintiffs Have Stated a Claim Under the Lanham Act

Defendants argue that Plaintiffs have not stated a claim under the Lanham Act because Plaintiffs have not alleged any false or misleading statements made by Defendants about either Plaintiffs' or Defendants' products.

In order to state a claim for false advertising under the Lanham Act, a plaintiff must, *inter alia*, allege that defendant "made false or misleading statements as to his own product or another's."[62] But as discussed *supra*, none of the statements identified by Plaintiff meet that threshold. Defendants' reference to non-Gentex helmets as "counterfeit," "obsolete," and "nonconforming" cannot be understood as referring to Plaintiffs' products. Defendants' claim that the SPH-5 helmet is "Mil-Spec," for example, means simply that it meets "current military specifications." And the Damaged Helmet Graphic is neither false nor misleading. Plaintiffs' Lanham Act claim, therefore, will be dismissed.

## I. Whether Plaintiffs Have Stated an Antitrust Claim

Defendants argue that Plaintiffs have not stated an antitrust claim because Plaintiffs have not alleged an antitrust injury and because Defendants' conduct was immunized by the *Noerr-Pennington* doctrine.

As the United States Court of Appeals for the Third Circuit has noted, "antitrust liability cannot be predicated solely on petitioning to secure government

---

[62] *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011).

action."[63] Therefore, to the extent that Plaintiffs' antitrust claims are based upon Defendants' alleged attempt to influence action[64] by the OAG and other DOI agencies, Defendants' actions[65] were immunized under the *Noerr-Pennington* doctrine.

To the extent that Plaintiffs' antitrust claims do not rest on that basis—and instead rest solely on Defendants' advertising campaign, including publication of the White Papers—Plaintiffs have failed to allege a sufficient injury. To bring a federal antitrust claim,[66] a plaintiff must allege "the existence of *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and

---

[63] *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hosp.*, 185 F.3d 154, 158 (3d Cir. 1999).

[64] This is true even if the governmental action in question was the purchase of helicopter helmets, because the "Third Circuit does not recognize a commercial exception to the *Noerr-Pennington* [d]octrine." *Asphalt Paving Systems, Inc. v. Asphalt Maintenance Solutions, LLC*, 2013 WL 1292200 * 5 (E.D. Pa. March 28, 2013).

[65] Plaintiffs argue that Defendants' actions vis-à-vis the OAG and DOI were "a mere sham to cover what [was] actually nothing more than attempt to interfere directly with [Plaintiffs'] business relationships." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991). The "sham exception" to the *Noerr-Pennington* doctrine only applies, however, when a defendant's "activities are not genuinely aimed at procuring favorable government action at all." *Id.* Because this theory of Plaintiffs' claims rests on Defendants' alleged ability to obtain government action (*e.g.*, the publishing of the AP Bulletin and the 2013 ALSE Handbook, and the government's purchase of helicopter helmets), the sham exception does not apply. *See* Daniel A. Crane, Antitrust 181(2014) ("An anticompetitive scheme that could work only if the defendant is successful in persuading the government to take action favorable to it is, by definition, not a sham.")

[66] 15 U.S.C. § 15 creates a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden by the antitrust laws"—*i.e.*, for violations of the Sherman Act.

that flow[] from that which makes defendants' acts unlawful."[67]  Federal antitrust law, however, "does not compel your competitor to praise your product or sponsor your work."[68]  To the extent that Plaintiffs were harmed by Defendants' apparently successful publicity campaign, the proper response is to create better publicity themselves.  Antitrust law, after all, "protect[s] competition, not competitors."[69]

Plaintiffs' antitrust claims, therefore, will be dismissed.[70]

## III. CONCLUSION

For the reasons discussed above, all claims in Plaintiffs' Amended Complaint will be dismissed.  Because this Court finds that amendment will be futile, the dismissal will be with prejudice.  An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[67] *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 382, 334 (1990); *see also id.* ("[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, since it is inimical to the antitrust laws to award damages for losses stemming from continued competition.")

[68] *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 132 (3d Cir. 2005) (quoting *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989)).

[69] *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996).

[70] Because Plaintiffs' civil conspiracy claim is derivative of Plaintiffs' other claims, and because all other claims have been dismissed, Plaintiffs' civil conspiracy claim will also be dismissed.